# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SGT. JEFFREY S. SARVER,

                         Plaintiff,                         Civil Action No. 2:10-cv-01076 DMC

vs.

THE HURT LOCKER, *et. al.*,

                         Defendants.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

       By and through counsel, Plaintiff JEFFREY S. SARVER files his instant opposition to Defendants' motions to dismiss.  In support of his opposition, Plaintiff submits the accompanying brief.

Submitted by:

/s/ Linda George             /s/ Todd Weglarz
Attorney at Law               Geoffrey N. Fieger
577 Summit Ave              Todd Weglarz
Hackensack, NJ 07601       Fieger, Fieger, Kenney, Johnson & Giroux, P.C.
(201) 487-5225              19390 W. Ten Mile Road
lgdefense@yahoo.com       Southfield, Michigan 48075
                                (248) 355-5555
                                t.weglarz@fiegerlaw.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SGT. JEFFREY S. SARVER,

                    Plaintiff,                    Civil Action No. 2:10-cv-01076 DMC

vs.

THE HURT LOCKER, *et. al.*,

                    Defendants.

_____/


**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

I.      Background Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II..    Applicable Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  A.      This Court has personal jurisdiction over Defendants, and therefore their motions
    to dismiss under Rule 12(b)(2) should be denied**..**. . . . . . . . . . . . . . . . . . . . . . . 11

    1.      Defendants Boal and Bigelow both benefitted from the commercial
      exploitation of the Hurt Locker in New Jersey. . . . . . . . . . . . . . . . . . . . 13

    2.      According to the Supreme Court's decision in *Keeton v. Hustler
      Magazine*, 465 U.S. 770 (1984)*,* this Court may exercise personal
      jurisdiction over Defendants Hurt Locker, Voltage Pictures, Chartier, and
      Summit Entertainment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

  B.      Under § 1391, venue is proper in this district because the court has personal
    jurisdiction over defendants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

  C.       Plaintiff's complaint states cognizable claims under New Jersey law.. . . . . . . . 16

  D.      Plaintiff was a beneficiary of the contract entered into between Defendants
    Playboy and Boal, and the Department of Defense**.** . . . . . . . . . . . . . . . . . . . . . . 26

  E.      Under New Jersey Law, Plaintiff has alleged sufficient facts to state a viable
    claim for Intentional Infliction of Emotional Distress . . . . . . . . . . . . . . . . . . . . 27

  F.      Plaintiff has stated cognizable claims for actual, intentional, and constructive
    fraud as well as negligent misrepresentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Conclusion/Relief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## I.  Background and Facts

Plaintiff Jeffrey Sarver has been a member of the United States Army since October 7, 1991, and continues to serve as a Master Sergeant.  In July 2004, Plaintiff was part of the 788th Ordnance Company and was highly trained and skilled in the subject of explosive ordnance disposal ("EOD"). In July, Plaintiff's unit was deployed to Iraq and Plaintiff was commanded to assemble and lead one of three EOD teams (i.e., "Bomb Squad" teams) while stationed in Iraq.  Plaintiff's mission was to identify, render safe, and dispose of hazardous unexploded conventional munitions (i.e., "IEDs"). Because the war zones were inundated with IEDs, Plaintiff's job as an Army EOD tech in Iraq was very dangerous, such that bomb techs were five times more likely to die in Iraq than all other soldiers in theater.

In December of 2004, Defendant Boal,  a writer for Playboy Magazine, was embedded with Sgt. Sarver's unit at Camp Victory in Baghdad, Iraq. Plaintiff alleges that Defendant Bigelow first learned of Boal's mission sometime in 2003 after which, Plaintiff alleges, Bigelow shared with Defendant Boal how he could use his media embedment as a vehicle to come up with a "screenplay" for a commercial movie.

Shortly before Defendant Boal's embedment, Plaintiff and the rest of the 788th's members were advised by their Command of Defendant BOAL's upcoming 30 day embedment, and that service members were to accommodate Boal as he was to report on and write, in general, about EOD operations in Iraq.  Shortly after Boal's embedment, he stated, represented to, and assured the Company's service members, including Plaintiff, that he was working on a report / story, in general, about EOD operations in Iraq.

During his embedment with the 788th Company in Iraq, Boal almost exclusively followed and accompanied Plaintiff and his EOD team during the 30 day embedment period, including accompanying Plaintiff while on various different EOD missions and assignments, as well as accompanying Plaintiff after operations when Plaintiff retired for his shift back at the camp.

Throughout his embedment, Boal took multiple photographs, videos, and audio recordings of Sgt. Sarver and other service members, and again emphasized and assured the service members these were necessary for his general report / article on EOD.   During this time, Boal became acquainted with not only the *general* military operations of the 788th's EOD, but also with Plaintiff's personal information and life story by virtue of the questions Boal directed to Plaintiff, and by virtue of Boal's ubiquitous presence around the Plaintiff, including the need to even document Plaintiff's personal environment and effects, including Plaintiff's closed off personal bedroom / sleeping area.

After hearing Sgt. Sarver's use the phrase "the hurt locker" on multiple occasions, Boal asked Plaintiff what he meant by that phrase to which question Sarver answered.    At no time during this period, however, did Boal ever advise the 788th Company's service members, including Plaintiff, that he intended to use his government issued embedment for the purpose of exploiting Plaintiff by gathering Plaintiff's personal information, photographing his likeness, videotaping his likeness, mannerisms, and habits, and recording his discussions, which would later be published in the form of a sensational, personal, private, and embarrassing story or movie about the Plaintiff (in which selected parts are even untrue and defamatory).

Plaintiff's deployment ended in January of 2005.  By this time, Plaintiff honorably and courageously served his country, fellow service members, and Iraqi civilians, by having disarmed

more IEDs than any single team since the operations began in Iraq.  Sgt. Sarver was awarded the bronze star for his commitment and service to his country.

Shortly after Plaintiff's return home to Wisconsin, Defendant BOAL began asking the Command of the 788th Company for a "visit" with the service members in Wisconsin for the ostensible purpose of  finishing his "article" by documenting they were now "safely home."  In August/September 2005, Defendants Playboy and Boal released an eleven page article which was focused not on EOD *in general*, but rater focused on Plaintiff Sarver's personal life[1] (**Exhibit A**).

Immediately after receiving a copy of the Playboy article, Plaintiff advised Defendants he did not approve of the article because it was about him personally, contained several untruths, and portrayed him in a false light in various different sections.  In response, Playboy informed Plaintiff that it was 'too late' and that the article was already scheduled to be released which it was in September 2005.  The article focused entirely on Plaintiff Sarver, his personal life and history, his marital and family issues, among other things, and portrayed him as having morbid fascinations with explosives. An abridged version of the article surfaced again when it was republished in Reader's Digest in 2006.

On June 26, 2009, Defendants The Hurt Locker, Voltage Pictures, Nicholas Chartier initiated the limited released of the motion picture film "The Hurt Locker" in the cities of New York and Los Angeles.  The screenplay was written by Defendant Boal, and the film was directed by Defendant Bigelow.  The film underwent a more widespread release in the United States on July 24, 2009.  The film underwent a complete nationwide release on January 12, 2010.  At no point in time did *any*

---

[1] The title alone illustrates the plain and simple fact that the Playboy Article is really a personal article about Plaintiff Jeffrey Sarver – "For Staff Sergeant Jeffrey Sarver … the war in Iraq couldn't get any more personal.  What's it like to be THE MAN IN THE BOMB SUIT".

Defendant ever so much as even ask Plaintiff for his consent to use his personal story, name, and/or likeness in a major motion picture.  At no time did Plaintiff ever agree to, consent to, request, or acquiesce in, the making and publication of a movie about himself, his family, or his military activities while in Iraq.

In March 2010, Plaintiff filed the instant eight count complaint against the various entities and individuals associated with the film alleging the following: (1) misappropriation of likeness for commercial exploit, (2) false light invasion of privacy, (3) defamation and defamation *per se*, (4) breach of contract, (5) intentional infliction of emotional distress, (6) actual and intentional fraud, and (7) constructive fraud and negligent misrepresentation.

Defendant Playboy has filed its motion to dismiss under Fed. R. Civ. P. 12(b)(3) alleging improper venue, alternatively that this matter should be transferred to the Central District of California under 28 U.S.C. §§ 1404 & 1406.

Defendants Hurt Locker, Voltage Pictures and Voltage's CEO Nicholas Chartier filed their motion to dismiss under Fed. R. Civ. P. 12(b)(2) alleging lack of personal jurisdiction; Defendants also seek dismissal under Rule 12(b)(3) for improper venue or alternatively request transfer under § 1404.  These Defendants also seek dismissal under Rule 12(b)(6) alleging that Plaintiff has failed to state cognizable claims against them.

Defendants Boal and Bigelow have also filed their motion to dismiss under Rule 12(b)(2)-(3) for lack of personal jurisdiction and improper venue or alternatively for transfer under § 1404.  Boal and Bigelow also contend that Plaintiff's claims are subject to dismissal under Rule 12(b)(6) for failure to state a claim.  Both The Hurt Locker Defendants, and Boal and Bigelow contend that all of Plaintiff's claims are barred by the First Amendment.

Defendant Summit Entertainment has joined Defendants' motions to dismiss based for improper venue under Rule 12(b)(3) or alternatively for transfer under § 1404. Relying on Rule 12(b)(6), Summit also joins Defendants' motions contending that Plaintiff has failed to state cognizable claims for relief.

## II.  Applicable Law

**A.    This Court has personal jurisdiction over Defendants, and therefore their motions to dismiss under Rule 12(b)(2) should be denied.**

Defendants Boal, Bigelow, Hurt Locker, Voltage Pictures, and Chartier seek dismissal under Rule 12(b)(2) for lack of personal jurisdiction. For the following reasons, the Court should deny their motions.

When reviewing a motion to dismiss for lack of personal jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc., v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003). Once a defendant challenges a court's exercise of personal jurisdiction, the plaintiff bears the burden of establishing personal jurisdiction. *Gen Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001).

A court deciding a motion to dismiss for lack of personal jurisdiction has three options; (1) to rule on the motion on the basis of the affidavits submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion. *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (finding that prior to an evidentiary hearing, "the plaintiff[s] [are] entitled to have [their] allegations taken as true and all factual disputes drawn in [their] favor").

If the district court does not hold an evidentiary hearing, "the plaintiff[s] need only establish a prima facie case of personal jurisdiction." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316

-8-

(3d Cir. 2007). "A federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir. 1987). As Hurt Locker Defendants concede in their brief, "New Jersey permits long-arm jurisdiction to the extent that it comports with the Due Process Clause of the United State Constitution. See N.J. Civ. Prac. R. 4:4-4)." (Defendant Hurt Locker Brief in Support of Motion to Dismiss, pg. 8).

Given New Jersey's long-arm statute, this Court may assert personal jurisdiction over Defendants so long as its exercise of jurisdiction comports with the Due Process Clause of the Constitution. Personal jurisdiction may be either general or specific. Here, Plaintiffs allege that this Court has specific jurisdiction over each of the named Defendants.

In order to find specific jurisdiction, the court applies a three-part test. First, the defendant must have "purposefully directed [its] activities" at the forum. *D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94 (3d Cir. 2009)(quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Second, the litigation must "arise out of or relate to" one of defendants' activities in the forum. *Id.* (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Assuming the first two requirements are met, the court then considers whether the exercise of jurisdiction otherwise 'comport[s] with 'fair play and substantial justice.'" *Id.* (internal citations omitted).

The first two requirements ensure that a defendant has the requisite minimum contacts with the forum such that it "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). On this point, defendant's physical entrance into the forum is not a necessary showing. *Burger King*, 471 U.S. at 476; *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993). Here, the Court should

conclude that Defendants' purposefully availed themselves of the privilege of conducting business activities within the forum such that this Court may assert personal jurisdiction over them.

1. **Defendants Boal and Bigelow both benefitted from the commercial exploitation of the Hurt Locker in New Jersey**

Defendant Boal wrote both the article that first appeared in Playboy, and later wrote the screenplay that was adapted to the film "The Hurt Locker." Boal's article and screenplays were based extensively on Plaintiff Sarver, his personal life, and his military career. Boal's purpose in misappropriating Plaintiff's likeness was solely for commercial exploitation; that is, he was well paid for both the article that appeared in Playboy and later for his screenplay that served as the basis of the film. At the same time, Boal was communicating with Defendant Bigelow about his project and how to maximize their potential return on a screenplay and film.

Defendant Bigelow, on the other hand, was directly involved in the production of the film as the director. All the while, Bigelow knew from her first-hand conversations that Defendant Boal had gleaned personal details about Plaintiff Sarver's life as the basis for *their* film that was eventually distributed and released in theaters in New Jersey. Bigelow, like Boal, received substantial commercial benefit from the misappropriation of Plaintiff's likeness. Indeed, Defendants even took steps to ensure the film's main character spoke with Plaintiff Sarver's same West Virginia accent. These facts, as alleged in Plaintiff's complaint, demonstrate that Defendants Boal and Bigelow both knew and intended that their screenplay and film would be produced and distributed throughout theaters in the U.S., including New Jersey.

Under these facts, Defendants Bigelow and Boal purposefully availed themselves of the privilege of commercial exploitation of their film in New Jersey. Their certifications and affidavits attached to their motions to dismiss do nothing to change these facts. In their certifications,

Defendants Boal and Bigelow contend that they are not residents of New Jersey, do not conduct business there, and have not traveled to the state, and thus they contend, they lack minimum contacts to satisfy personal jurisdiction.  Plaintiff disagrees.

In this situation, the analysis does not focus on whether Defendants have actually stepped foot into New Jersey.  Rather, the Court must consider whether Defendants engaged in activities from which they could expect to be hailed into a New Jersey Court.  The answer to this question, Plaintiff submits, is yes.  Defendants misappropriated Plaintiff's likeness for their own commercial gain, and distributed their project in venues across New Jersey.  In other words, there was a trickle down of commercial value that originated in New Jersey and was eventually conferred upon Defendants Boal and Bigelow.  And this trickle down effect was not by happenstance or mistake. Rather, it was the result of calculated decisions to produce, direct, and distribute the film (in exchange for monetary value) in theaters across the country, including New Jersey. Based on these facts, the Court should conclude that Defendants Boal and Bigelow purposefully availed themselves of the privilege of conducting business in New Jersey, and are therefore subject to the jurisdiction of this Court.

Assuming, *arguendo*, that this Court finds factual disputes relating to the exercise of personal jurisdiction over Defendants Boal and Bigelow (relating to their specific activities, contract for services, monetary gain arising from the distribution and showing of the film, etc.), Plaintiff respectfully requests jurisdictional discovery followed by an evidentiary hearing on the issue before the Court rules.

**2.      According to the Supreme Court's decision in *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984), this Court may exercise personal jurisdiction over Defendants Hurt Locker, Voltage Pictures, Chartier, and Summit Entertainment**.

This Court also has jurisdiction over Defendants Hurt Locker, Voltage Pictures, Voltage CEO Chartier, and Summit Entertainment as these Defendants were responsible collectively for the distribution and release of the film in New Jersey theaters. *Keeton v. Hustler Magazine* is a case on point from the United States Supreme Court. There, the Supreme Court held that a publisher's course of conduct in circulating magazine throughout the forum state was "purposefully directed" at the forum and "inevitably affected" persons in the state, and that such contacts were sufficient for the court to exercise personal jurisdiction.

In *Keeton*, the plaintiff was a resident of New York who filed suit in federal district court of New Hampshire against an Ohio magazine publisher based on diversity jurisdiction. The plaintiff's only connection to New Hampshire was the circulation there of a magazine that she assisted in producing. Apparently, Plaintiff's suit would have been time barred in all jurisdictions except New Hampshire, and hence she filed suit there. The district court dismissed the action based on lack of personal jurisdiction and the First Circuit affirmed the dismissal. The United States Supreme Court granted certiorari and reversed.

In finding that the lower court had personal jurisdiction, the Supreme Court emphasized that the magazine publisher, like the instant Defendants, availed themselves of the business opportunity to sell their magazine in New Hampshire. Distributing and selling magazines in the forum state, according to the Supreme Court, "cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous." *Keeton*, 465 U.S. at 774. The *Keeton* Court went on to explain that:

> A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor

shall be liable for damages which are the proximate result of his tort.'" *Id.* (quoting *Leeper v. Leeper*, 114 N.H. 294, 298 (1974)(internal quotations omitted).

The interest extends to libel actions brought by nonresidents. False statements of fact harm both the subject of the falsehood *and* the readers of the statement. New Hampshire may rightly employ its libel laws to discourage the deception of its citizens. There is "no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).

New Hampshire may also extend its concern to the injury that in-state libel causes within New Hampshire to a nonresident. The tort of libel is generally held to occur whenever the offending material is circulated. Restatement (Second) of Torts § 577A, Comment a (1977). The reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous. The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however, small, at least unblemished.

*Keeton*, 465 U.S. at 776-77 (internal citations omitted). The same reasoning and holding of *Keeton* applies here with equal force.

Here, Defendants produced and distributed for commercial gain a film that misappropriated Plaintiff's likeness. Defendants intentionally and deliberately distributed the film to theaters in New Jersey for its residents to view for monetary exchange. These Defendants, by and through their agents, entered into agreements and/or contract to distribute and release their film in New Jersey theaters, and they did so for *their* commercial benefit. The facts of this case are no different than the facts of *Keeton* where a magazine published availed itself of the commercial privileges of New Hampshire. Based on these facts, the Supreme Court readily concluded that the magazine publisher could be hailed into a New Hampshire court to respond to allegations of privacy torts. This case is the same, and for the same reasons in *Keeton*, this Court should conclude that it may exercise personal jurisdiction over Defendants, just as the Supreme Court concluded in *Keeton*.

**B.      Under § 1391, venue is proper in this district because the court has personal jurisdiction over defendants.**

All of the Defendants in this case have moved for dismissal under Rule 12(b)(3) contending that this district court lacks venue.  Based on the plain language of § 1391, Plaintiff disagrees.  Title 28 U.S.C. § 1391(a) addresses venue in a diversity action in federal court.  Specifically, the statute provides that "A civil action wherein jurisdiction is founded only on diversity of citizenship may . . . be brought only in [] (3) a judicial district in which *any defendant* is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought."  As set forth herein, this Court has personal jurisdiction over Defendants, and venue is therefore proper under § 1391.

To the extent that Defendants contend that there is a more convenient venue elsewhere, the Court should reject these arguments.  Seemingly, Defendants are seeking not only a more convenient forum for them, but also a more amenable forum to their legal arguments.  Sitting in diversity jurisdiction, a federal district court is to apply the substantive law of the forum state.  By attempting to move this suit to California, Defendants are also seeking to apply California law which is arguably more beneficial to them.  Apparently, that is also why Defendant Playboy, whose principle place of business is in Illinois, would also like to avail itself of California law.  It is exactly for such reasons that the venue statute, 28 U.S.C. § 1391, finds venue proper in diversity actions if the court has personal jurisdiction over *any defendant* in the suit.

In this case, Plaintiff exercised his right to file suit in this forum, just as the plaintiff in *Keeton* filed suit in New Hampshire.  In *Keeton*, the Supreme Court emphasized that in privacy torts cases arising from multi-state publications, each state arguably may have personal jurisdiction over the defendant publisher because each state has an interest in protecting against privacy torts.  So it

is here.  Under § 1391, if the Court has jurisdiction over *any defendant*, then venue is proper.

Seemingly, Defendants' contentions are based on convenience and not venue.  As set forth under § 1391, venue is proper in this Court if the Court has jurisdiction over *any defendant*.  For the reasons stated herein, and based on the Supreme Court's poignant discussion in *Keeton* relevant to the instant case, this Court has personal jurisdiction over Defendants, and thus venue is proper.  Defendants' policy arguments directed toward their convenience should be rejected in light of the *Keeton* and the express language of § 1391.

For the same reasons, the Court should give weight to Plaintiff's choice of forum and deny Defendants' motions to transfer under 28 U.S.C. §§ 1404 & 1406.  In a case like this involving multi-state publication with multiple defendants, it is difficult, if not impossible, to choose one forum convenient to all of the parties.  In this instance, Defendant Playboy is an Illinois business entity while other Defendants are California entities, and Plaintiff was, at the time, a New Jersey resident.  Given these facts, the Court should give great weight to Plaintiff's choice of forum, so long as the Court has personal jurisdiction over Defendants sufficient to maintain suit.  Had Plaintiff brought suit in the Northern District of Illinois, or elsewhere, each of the parties would incur the same burden as they do now defending against this action in New Jersey.

Defendants have also overstated the burdens incident to discovery in this matter.  Depositions may be noticed in any district wherein a party or witness resides.  It would be Plaintiff's burden, under such circumstances, to travel to the district in which a deponent resides for purposes of discovery.  At the same time, documents can be inspected, copied, scanned, or sent to/from any districts in the United States with relative ease, or at the burden and/or expense of Plaintiff.

-15-

Defendants' proffered reasons to support their request for transfer should not trump Plaintiff's choice of forum.

### C.  Plaintiff's complaint states cognizable claims under New Jersey law

When considering a Rule 12(b)(6) motion to dismiss, the trial court must accept all the allegations in the complaint as true and construe the complaint liberally in favor of the plaintiff. FED. R. CIV. P. 12(b)(6); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Wisniewski v. Jonns-Manville Corp.*, 759 F.2d 271, 273 (3d Cir. 1985).  A court may not grant a motion under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

When reviewing the facts pled in a complaint, the district court must make all reasonable inferences derived from those facts.  *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1400 (3d Cir. 1991).  Furthermore, Plaintiff need not pled his evidence, and it is not necessary to plead the facts that serve as the basis for the claim.  *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977).

Here, Plaintiff has stated cognizable claims under New Jersey Law as to each of his Counts for relief.  Accordingly, Defendants' motions to dismiss for failure to state claims should be denied in toto.

To successfully state a claim under the common law theory of invasion of privacy, one must have a cause of action that falls under one (1) of four (4) categories. The *Restatement of Torts* lists:

> The four areas of invasion of privacy as generally including (1) intrusion upon a plaintiff's seclusion or solitude, or into his private affairs, (2) public disclosure of embarrassing private facts about a plaintiff, (3) publicity which places the

> plaintiff in a false light and (4) appropriation, for the
> defendant's advantage, of the plaintiff's name or likeliness.

*Faber v. Condecor, Inc.*, 195 N.J. Super 81, 86 (1984)(citing *Pooley v. National Hole-In-One*, 89

F. Supp. 2d 1108,1111 (2d Circuit 2000)).  As set forth below, Plaintiff has set forth sufficient

pleadings for each cause of action challenged by Defendants.

### A. Plaintiff Has Successfully Pleaded His Claim for False Light/Defamation

In order for Plaintiff to maintain a successful claim against Defendants under the privacy tort

of false light, Plaintiff must prove that Defendant placed "another in a false light before the public,

provided that the false light in which the other was placed would be highly offensive to a reasonable

person, and that the actor had knowledge of or acted in malice or reckless disregard as to the falsity

of the publicized matter and the false light in which the other would be placed."  Restatement

(Second) of Torts § 652E (1965).  Plaintiff is able to prove that Defendants in this case placed

Plaintiff in a false light before the public, with a reckless disregard for Plaintiff personal life that

would be highly offensive to a reasonable person, and Defendants knew the materials in which they

were disseminating was that of inaccurate nature in regards to Plaintiffs professional and personal

life.

The privacy torts of false light and defamation are often categorized as one for purposes of

liability.  As stated in *Eastwood, supra,* cited in *Rumbauskas,* "the Washington Supreme Court

observed that "[w]hile all false light cases need not be defamation cases, all defamation cases are

potentially false light cases [,]" quoting Dean Prosser's concern that the false light tort might be

"capable of swallowing up and engulfing the whole law of defamation...." 722 P.2d at 1297 (quoting

W. Prosser, *Torts* § 117 at 813 (4th Ed. 1971)). *Swan v. Boardwalk Regency Corp.* 407 N.J. Super.

108, 122 (N.J. Super. A.D. 2009).  Further, as a result of Defendant's false and defamatory statements concerning Plaintiffs fitness and integrity in the performance of his daily function as a Master Sergeant in the United States Army, as well as in Plaintiffs family affairs, Plaintiff has been significantly injured.

Additionally, the Plaintiffs name, reputation and accomplishments have been diminished greatly by the false allegations made by Defendants in producing/showing the *Hurt Locker*. "In New Jersey, the right of publicity generally applies to situations where the plaintiff's name, reputation or accomplishments are highly publicized and the defendants use that fact to his or her own advantage." *Palmer v. Schonhorn Enterprises, Inc*. 96 N.J. Super. 72, 76 (3d. Cir. 1967).  Here, the only purpose of Defendants' using the life story of Plaintiff was for that of their own personal gain/advantage, to the detriment of Plaintiff.  The *Hurt Locker* was specifically made with the image and likeness of Plaintiff in mind due to the simple fact that Defendant Boal supplied all of Plaintiffs characteristics to both Defendant Playboy and Defendant Bigelow.  The <u>only</u> conclusion that any reasonable person would be lead to believe when looking at the life story of Plaintiff, and that of the 'character' portrayed in the movie is that  One could conclude the *Hurt Locker* was specifically written off the life events of Plaintiff.

Specifically, Defendants have portrayed Plaintiff as a reckless, gung-ho war addict who has a morbid fascination with death which causes him to carelessly risk both his and his colleagues' lives in the theater of war, simply to feel the thrill of cheating death.  (Complaint  ¶¶ 68).  Defendants knowingly portrayed Plaintiff; through the acting of Jeremy Renner; in this manner knowing that the movie would garner better ratings if they depict Plaintiff in a light less favorable than what is the actual reality of Plaintiff's life.   Defendants <u>knew</u> or reasonably should have known, that

showing the likeness of Plaintiff as a man who was abnormally fascinated with death, who had a drinking problem and who struggled with personal relationships would be more marketable and profitable for the movie than that of a devout father figure who rarely drank and simply performed a job function. (*Id.* at ¶¶ 67). Defendants have not only ruined the Plaintiffs reputation and position as a Master Sergeant within the United States Army, Defendants have placed Plaintiff in a false light, ultimately portraying Plaintiff as an unstable person who is addicted to the thrill of war and as a bad father. (*Id.* at ¶¶ 79).

Defendants assert that Plaintiff was not identified, by name or otherwise, therefore Plaintiff lacks any claim for False Light and Defamation. In fact, Defendants claim that because they sufficiently supplied a disclaimer stating that the motion picture was a "work of fiction", it simply could not illustrate that of Plaintiffs' life. Defendants were put on notice that Plaintiff did in fact believe that the story written by the 'embedded journalist' Defendant Boal was based on Plaintiffs life and untrue (Complaint, ¶¶ 53,54), thereby placing Defendants on notice that Plaintiff believed the story being published was that of Plaintiffs own story. Instead of retracting said story from Playboy, Defendants continued to portray Plaintiff in a light unfavorable to both his personal and professional life by producing the *Hurt Locker*. Plaintiff must be afforded the luxury of being free from personal defamation. It has long been held that "The law of defamation is rooted in the notion that individuals should be free to enjoy their reputations unimpaired by false and defamatory attacks." *Thomas John Salzano v. North Jersey Media Group Inc. et. al.* 2010 WL 1849852, (N.J. 2010). Here, Defendants took the events of Plaintiffs life and twisted the facts in a way that would produce a high grossing movie, to the detriment and reputation of Plaintiffs career and well-being. Defendants knew the information they published/showed were untrue facts based upon Plaintiffs'

life and anyone knowing of Plaintiff would be able to establish a similarity between the *Hurt Locker* story line and that of Plaintiff.

For the foregoing reasons, Plaintiff has successfully met the required elements to survive a Rule 12(b)(6) motion as it relates to false light/defamation.

### B.  Plaintiff Has Sufficiently Pleaded His Claim for Misappropriation/Right of Publicity

Privacy is an inalienable right that all American's have an interest to protect. When this interest is compromised, to bring a successful claim for invasion of privacy, the Plaintiff must claim one of four areas that were intentionally intruded upon by the Defendant regarding the Plaintiff's personal and private life.  Under New Jersey law, Defendants are liable for the misappropriation of Plaintiff's likeness if they used his likeness for a predominantly commercial purpose (i.e., Defendants were seeking to capitalize on Plaintiff's likeness for purposes other than the dissemination of news or information).  *Castro v. NYT Television*, 370 N.J. Super. 282, 297 (2004).

The elements of misappropriation, of which are met in the case at hand, include: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to the defendants advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Id.* at 1112.  Plaintiff is able to establish by clear and convincing evidence each and every element required under the right to privacy standard of both misappropriation/false light to survive this claim.  As previously mentioned, New Jersey utilizes the Restatement Second of Torts when defining the tort of invasion of privacy.  Plaintiff reiterates that Defendants knowingly and maliciously interfered with his right to privacy from publicity of his private life.  Under the Restatement definition, a required element of the torts of publicity given to private life and publicity

placing a person in false light is publicity.  Restatement (Second) of Torts §§ 652D, 652E (1977).
Comment *a* to section 652E refers to Comment *a* to section 652D for a discussion of "what
constitutes publicity." *Id.* at Comment a.  Comment *a* to section 652D defines publicity as making
the matter "public, by communicating it to the public at large, or to so many persons that the matter
must be regarded as substantially certain to become one of public knowledge.... It is [a matter] of
a communication that reaches, or is sure to reach, the public." *Id.* at § 652D cmt. a.

     Plaintiff has alleged (1) Defendants' use of Plaintiffs identity (Complaint, ¶¶
52,63,65,66,67); (2) the appropriation of Plaintiffs name or likeness to Defendants' advantage,
commercially or otherwise (*Id.* at  ¶¶ 52,53,56,57,58,59,60,72,101); (3) Plaintiffs lack of consent
(*Id.* at ¶¶ 52,53,54,61,62,103); and (4) resulting in injury to Plaintiff.  (*Id.* at ¶¶ 64,68,69,93).
Defendants seem to have admitted Plaintiff has sufficiently pleaded his cause of action, by seeking
to apply the First Amendment exception to the common law cause of action.  The First Amendment
argument set  forth by Defendant is inapplicable as Plaintiff does not allege the use was "in
connection with any news, public affairs, or sports broadcast or account, or any political campaign,"
a requirement for protection under the First Amendment exception.  Further, consideration of the
applicability of such an exception is inappropriate in the pleadings stage.

Every American has a property interest in their being and likeness. "In the concept of 'right to
privacy' there is implicit the right of property, at least in the instance of an appropriation by a
defendant of another's likeness." *Canessa v. J. I. Kislak, Inc*. 97 N.J. Super. 327,339 (3d.Cir. 1967).
Plaintiff had a specific property interest in his likeness, an interest in which Defendants maliciously
and deceitfully stole from Plaintiff without his permission or consent.  The Court further explains
in *Canessa* that your likeness and right to privacy goes beyond that of a property right, rather, "the

right of privacy exists as an independent right and it is not merely an incident to some other long recognized rights such as those of property or contract." *Id.* at 346.

Defendants argue that the Plaintiff has no right to an interest in Plaintiffs' publicity.  This statement is wholly and factually unsupported by Defendants and cannot be used to prove Defendants contention that Plaintiff has <u>no rights</u> in his likeness for the simple fact that Plaintiff not only has a *property* interest in his likeness, he also has a *privacy* interest in it as well.

For the foregoing reasons, Plaintiff has successfully met the required elements to survive a Rule 12(b)(6) motion as it relates to misappropriation/ right of publicity.

### C.  Plaintiff's claims are not barred by the First Amendment

Plaintiffs' claims for Right of Publicity, False Light, Misappropriation of Likeness and Defamation do not infringe on any of Defendants' First Amendment rights.  Defendants produced and sold for profit the life story of Plaintiff not for a news worthy purpose, or in the alternative as a matter of public interest, but rather they did so for the unequivocally purpose of making profit from that of Plaintiff's own personal story.

Defendants attempt to argue that all of Plaintiffs' claims should be barred by the First Amendment using a number of unrelated cases, stating that motion pictures are expressive works that are protected by the First Amendment.  *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1989).  Although Defendant's argue that the First Amendment allows them to use the likeness of Plaintiff and misappropriate his story for their own financial gain, principles of free speech are not

at issue in this case.  The claims set forth by Plaintiff relates to the use of Plaintiff's likeness while serving his country throughout Iraq while carrying out a very important and likewise, dangerous function in the United States Army as an Explosive Ordnance disposal technician.

Here, Defendants have used the life story of Plaintiff, both in the Plaintiff's personal and professional realm of life, to exploit his likeness for their own financial gain; used quotes created and often said by Plaintiff for both the title of said movie and in different contexts which were heard by Defendants throughout the movie; and portrayed many specific customs and practices that were unique to Plaintiff in the course of his everyday life throughout a majority of the movie.  (Complaint, ¶¶ 56).  Here, Defendants were given no consent or authority by Plaintiff to use Plaintiff's image or likeness in any realm of print or motion picture.  Defendants had no right to exploit the nature of his employment and personal family life, many of which facts stated by Plaintiff are untrue, while making an extraordinary amount of money in doing so.

Further, the case law cited by Defendants is wholly irrelevant to the case at hand.  Defendant cites *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118 (N.D. Cal. 2002), to further convey that use of an individual's likeness in a motion picture does not infringe on that person's right of publicity. However, the case cited by Defendants deals with an actor that <u>agreed</u> to be in the motion picture and was disputing the <u>advertisement</u> that portrayed the actors' likeness without consent.  In the case at hand, Plaintiff <u>never</u> authorized the publication of his life story in either Playboy Magazine or as a motion picture; in fact, he specifically requested that Playboy Magazine not run the article because of the nature of the information was obtained by deceit and was inaccurate. (Complaint, ¶¶ 49, 51,68)  Additionally, Defendants improperly cite *Ruffin-Steinback v. DePassees*, 276 F.3d 457 (6th Cir. 2001), stating that the holding in the case was based on the use of plaintiffs' fictionalized

likeness being protected by the First Amendment, when in reality, the holding of the case was "the use of plaintiffs' fictionalized likenesses in a work <u>protected</u> by the First Amendment and the advertising incidental to such uses did not give rise to a claim for relief under the plaintiffs' rights of publicity."  *Id*. at 462.

In *Ruffin-Steinback* , the court found that the First Amendment protected the particular work at question because the mini-series was "created [] for public interest." *Id.* at 462.  The *Hurt Locker* was not produced to inform the public of the missions Plaintiff was carrying out throughout the course of his daily activity in Iraq; rather, Defendants produced the movie for sheer profit at the expense of Plaintiff's reputation and privacy.

Defendants also reference *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1989), to argue that motion pictures are protected speech. That case specifically involved adult entertainment zoning restrictions and a challenge to a government ban on in-home subscriptions to adult entertainment, which does not support Defendants' effort to avoid liability in the case at hand. There are no such issues raised in this case, nor are there any disputes as to the in-home showing of the *Hurt Locker*, rather, in dispute is the movie in its entirety based on Plaintiff's life and accomplishments.

In most instances, the First Amendment is not a defense against that of misappropriation when it involves a private individual.  "The purpose of the portrayal in question must be examined to determine if it predominantly serves a social function valued by the protection of free speech… if the portrayal functions primarily as a means of commercial exploitation, then such immunity will not be granted."  *Tellado v. Time-Life Books, Inc*. 643 F.Supp. 904, 911 (3d Circuit 1986).

Defendants only purpose in writing, producing, and ultimately showing The *Hurt Locker* was to exploit the life and very personal nature of Plaintiff.  The *Tellado* case further explains that,

> the rationale for [protecting the right of publicity] is the straight-forward one of preventing unjust enrichment by the theft of good will.  No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay

*Id.* at 914.

Here, Defendants not only exploited every personal detail of the clients work and family life, Defendants garnered an enormous profit from Plaintiff's life, as well as nominations for many awards from the film without <u>ever</u> obtaining his consent to do so.  The allegations of Plaintiff's complaint are sufficient to state cognizable claims under New Jersey law.

For these reasons, Defendants' motions to dismiss Plaintiff's claims under Fed. R. Civ. P. 12(b)(6) should be denied.

**D.     Plaintiff was a beneficiary of the contract entered into between Defendants Playboy and Boal, and the Department of Defense.**

In his Complaint, Plaintiff alleges that Defendants are liable for breaching of contract. Specifically, in paragraphs 27 through 32, Plaintiff alleges that the Department of Defense ("DOD") has adopted polices and procedures whereby they allow certain media representatives to be "embedded" into the war.  In exchange for the Department of Defense agreeing to provide such up-front access to combat operations, the media agrees to be bound by the "ground rules" applicable to embedded media, which were agreed to and signed by the media prior to the embedding.  Based on these facts, Plaintiff alleges that he was a third party beneficiary to the contract entered into and

breached by Defendants.

New Jersey has long recognized and enforced contracts for the benefit of third parties. Specifically, N.J.S.A. 2A:15-2 provides that "[a] person for whose benefit a contract is made, either simple or sealed, may sue thereon in any court and may use such contract as a matter of defense in an action against him although the consideration of the contract did not move from him." *See also*, *Drewen v. Bank of Manhattan Co. Of N.Y.*, 31 N.J. 110, 155 A.2d 529 (1959); *Werner v. Kent Parking Garage, Inc.*, 133 N.J.L. 104 (Sup. Ct. 1945).

The purpose of the DOD's rules were to protect the privacy of combat units and personnel, including Plaintiff.  The DOD's ground rules also serve to restrict the type of information to be released or published by the media.  For example, release and/or publication of a service member's personal information is specifically limited to the member's name and hometown only, and only on condition that the service member has consented to the release of same.  Plaintiff, among others, was an intended beneficiary of such ground rules put into place by the DOD and agreed to by Defendants Boal and Playboy.  *See Fagliarone v. Consolidated Film Indust.*, A.2d 425 (1942), *affirmed* 36 A.2d 297 (1942)(holding that in order for one not privy to a contract to maintain an action thereon as a "third party beneficiary", it must appear that the contract was made and intended for his benefit.); *Crown Fabrics Corp. v. Northern Assur. Co.*, 124 N.J.L. 27, 10 A.2d 750(1940)(finding that a person who is not a party to a contract may bring suit where it appears that the contract was made for his benefit).

In this case, Defendants Boal and/or Playboy took advantage of the Department of Defense's opportunity to be "embedded" with Plaintiff's combat unit. Here, Defendant Boal and Playboy

agreed to be bound by the terms and conditions of the DOD's ground rules.   By releasing and

publishing the personal and intimate details of Plaintiff's life, Defendants Boal and Playboy

breached the terms of its contact with the DOD.   The remaining Defendants stand in privity with

Defendant Boal and Playboy by further exploiting, publishing, releasing, and distributing without

consent a major motion film about Plaintiff's personal life.   The genesis of this film comes as a

result of Defendants' deliberate failure to be bound by the DOD's ground rules prohibiting the

release and/or publication of the private details of Plaintiff's life.

**E.     Under New Jersey Law, Plaintiff has alleged sufficient facts to state a viable claim for Intentional Infliction of Emotional Distress**

    Contrary to Defendants' contentions, Plaintiff has stated a cognizable claim under New

Jersey law for intentional infliction of emotional distress.   "Generally speaking, to establish a claim

for intentional infliction of emotional distress, the plaintiff must establish intentional and outrageous

conduct by the defendant, proximate cause, and distress that is severe."  *Buckley v. Trenton Saving*

*Fund Society*, 111 N.J. 355, xx (1988)(adopting Restatement Second of Torts § 46 and recognizing

intentional infliction of emotional distress as a viable cause of action under New Jersey law).   As

adopted by the New Jersey Supreme Court, the Restatement provides that:

> One who by extreme and outrageous conduct intentionally or
> recklessly causes severe emotional distress to another is subject to
> liability for such emotional distress, and if bodily harm to the other
> results from it, for such bodily harm.

*Buckley*, 111 N.J. at 366.

    In this case, Plaintiff alleges that Defendant Boal fraudulently misrepresented the purpose

of his reporting in order to gain Plaintiff's trust.   At the same time, Defendant Boal was allegedly

-27-

talking to Defendant Bigelow about how to misappropriate Plaintiff's story for their own commercial benefit.  To do this, Boal photographed Plaintiff in his private living space, talked extensively to him about his background, his family, and his personal thoughts and ideas.  Boal did this under the false pretense of writing a general story about Plaintiff's military unit.

At no time did Defendant Boal tell Plaintiff that he was secretly planning to unveil Plaintiff's entire life history and story in an article published by Playboy and later a film that would eventually be distributed by Defendants and shown all over the world.  Each Defendant in this instance participated in the writing, producing, directing, distributing, and release of a film which exploited, to an extreme, the most humble beginnings of Plaintiff's life into a worldwide sensation.  These facts, as alleged, are sufficient to state a claim for intentional infliction of emotional distress under New Jersey law, and thus Defendants' motions to dismiss should be denied.

**F.     Plaintiff has stated cognizable claims for actual, intentional, and constructive fraud as well as negligent misrepresentation.**

Plaintiff also alleges in his complaint that Defendants are liable for actual, intentional, and constructive fraud, as well as negligent misrepresentation.  Every fraud in its most fundamental conception consists of "the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith."  *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 624 (1981)(internal citations omitted); *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 550 (1997).

Specifically, Plaintiff alleges that Defendant Boal purposefully misrepresented the nature of his reporting when he was given access by the DOD to be embedded with Plaintiff's unit. Plaintiff further alleges that while Boal was embedded, he repeatedly misrepresented the nature of

-28-

his anticipated story which he described would be a *general* account of the activities of Plaintiff's unit. Boal's representation, it turns out, were blatantly untruthful. Allegedly, Boal was in contact with Defendant Bigelow discussing how Boal could extract, by fraudulent means or otherwise, personal information from Plaintiff that would later serve as the basis of a screenplay to be made into a movie.

Only by fraudulently and/or negligently misrepresenting the nature and purpose of his reporting, Defendants Boal and Playboy were able to extract from Plaintiff personal and intimate details of his life that would later serve as the basis for their article and the film. As Plaintiff alleges in paragraph 49 of his Complaint, "had Defendant Boal advised [him] that he was gathering information for the purpose of publishing a story and/or even a movie, based upon the Plaintiff personally, Plaintiff, as well as other service members of the 788th, would have refused to answer or respond to Defendant's questions and other requests for information."

Based on these facts, Plaintiff has stated sufficient facts to support his claims of fraud and negligent misrepresentation such that Defendants' motions to dismiss should be denied.

**<u>Conclusion and Relief Requested</u>**

For the foregoing reasons, this Court should conclude that it has personal jurisdiction

over Defendants, that venue is proper under § 1391, and that Plaintiff has stated cognizable

claims for which he is entitled to relief.

Respectfully submitted,

/s/ Linda George                          /s/ Todd J. Weglarz
Attorney at Law                           Geoffrey N. Fieger
577 Summit Ave                            Todd Weglarz
Hackensack, NJ 07601                      Fieger, Fieger, Kenney, Johnson & Giroux, P.C.
(201) 487-5225                            19390 W. Ten Mile Road
lgdefense@yahoo.com                       Southfield, Michigan 48075
                                          (248) 355-5555
                                          t.weglarz@fiegerlaw.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

SGT. JEFFREY S. SARVER,

                Plaintiff,               Civil Action No. 2:10-cv-01076 DMC

vs.

THE HURT LOCKER, *et. al.*,

                Defendants.

_____/

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on July 6, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

                              /s/ Linda George_____
                              Attorney at Law
                              577 Summit Ave
                              Hackensack, NJ 07601
                              (201) 487-5225
                              lgdefense@yahoo.com

Dated: July 6, 2010